1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DYLAN SCOTT CORRAL,                    No.  2:  14-cv-3007 KJN P

12              Petitioner,

13        v.

14   WARDEN, FOLSOM STATE PRISON,

15              Respondent.

16

17   Introduction

18        Petitioner is a former state prisoner, proceeding without counsel, with a petition for writ of

19   habeas corpus pursuant to 28 U.S.C. § 2254.  Both petitioner and respondent have consented to

20   the jurisdiction of the undersigned.  (ECF Nos. 5, 19.)

21        Petitioner challenges his 2011 convictions for four counts of making criminal threats (Cal.

22   Penal Code § 422), assault and assault with a deadly weapon (Cal. Penal Code § 245), vehicle

23   theft (Cal. Veh. Code § 10851) and vandalism (Cal. Pen. Code § 594(a)).

24        Petitioner raises the following claims:  1) insufficient evidence (claims one, four, six );

25   2) perjury (claim two); 3) evidence tampering (claim three); 4) admission of inadmissible

26   testimony (claim five); 5) admission of inconsistent statements (claim seven); 6) ineffective

27   assistance of counsel (claim eight); and 7) ineffective assistance of appellate counsel (claim nine).

28        After carefully reviewing the record, the undersigned orders the habeas petition denied.

                                         1

1    II.   Standards for a Writ of Habeas Corpus

2           An application for a writ of habeas corpus by a person in custody under a judgment of a

3    state court can be granted only for violations of the Constitution or laws of the United States.  28

4    U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

5    application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California,

6    202 F.3d 1146, 1149 (9th Cir. 2000).

7           Federal habeas corpus relief is not available for any claim decided on the merits in state

8    court proceedings unless the state court's adjudication of the claim:

9                    (1) resulted in a decision that was contrary to, or involved an
                     unreasonable application of, clearly established Federal law, as
10                   determined by the Supreme Court of the United States; or

11                   (2) resulted in a decision that was based on an unreasonable
                     determination of the facts in light of the evidence presented in the
12                   State court proceeding.

13   28 U.S.C. § 2254(d).

14          Under section 2254(d)(1), a state court decision is "contrary to" clearly established United

15   States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in

16   Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a

17   decision of the  Supreme Court and nevertheless arrives at different result.  Early v. Packer, 537

18   U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

19          Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court

20   may grant the writ if the state court identifies the correct governing legal principle from the

21   Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

22   case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because

23   that court concludes in its independent judgment that the relevant state-court decision applied

24   clearly established federal law erroneously or incorrectly.  Rather, that application must also be

25   unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough

26   that a federal habeas court, in its independent review of the legal question, is left with a 'firm

27   conviction' that the state court was 'erroneous.'") (internal citations omitted).  "A state court's

28   determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

1    jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter,

2    131 S. Ct. 770, 786 (2011).

3        The court looks to the last reasoned state court decision as the basis for the state court

4    judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned decision,

5    "and the state court has denied relief, it may be presumed that the state court adjudicated the

6    claim on the merits in the absence of any indication or state-law procedural principles to the

7    contrary." Harrington, 131 S. Ct. at 784-85.  That presumption may be overcome by a showing

8    that "there is reason to think some other explanation for the state court's decision is more likely."

9    Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

10       "When a state court rejects a federal claim without expressly addressing that claim, a

11   federal habeas court must presume that the federal claim was adjudicated on the merits – but that

12   presumption can in some limited circumstances be rebutted." Johnson v. Williams, 133 S. Ct.

13   1088, 1096 (Feb. 20, 2013).  "When the evidence leads very clearly to the conclusion that a

14   federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de

15   novo review of the claim.  Id., at 1097.

16       Where the state court reaches a decision on the merits but provides no reasoning to

17   support its conclusion, the federal court conducts an independent review of the record.

18   "Independent review of the record is not de novo review of the constitutional issue, but rather, the

19   only method by which we can determine whether a silent state court decision is objectively

20   unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned

21   decision is available, the habeas petitioner has the burden of "showing there was no reasonable

22   basis for the state court to deny relief." Harrington, 131 S. Ct. at 784.  "[A] habeas court must

23   determine what arguments or theories supported or, . . . could have supported, the state court's

24   decision; and then it must ask whether it is possible fairminded jurists could disagree that those

25   arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at

26   786.

27   ////

28   ////

3

1   III.  Background

2          The opinion of the California Court of Appeal contains a factual and procedural summary.

3   After independently reviewing the record, the undersigned finds this summary to be accurate and

4   adopts it herein.

5          In December 2010, defendant and his girlfriend Jessica were
       staying in a tent in her parent's front yard. Defendant was
6          intoxicated and behaving aggressively. Because defendant was
       drunk, Jessica was afraid of him. They began arguing and defendant
7          was throwing their things out of his truck into the yard. Jessica told
       defendant to leave. She went into her parent's home and locked the
8          door. When Jessica told defendant she was going to call 911, he
       took a metal bar out of the truck, raised it in a threatening manner
9          and said he would break down the door and kill her before the
       police arrived. Jessica's parents called the police. Jessica told police
10         defendant was mentally unstable, that when he "snaps, it's really
       hard to get him out of it" and she was in fear for her safety.
11

12         About three months later, defendant, his friend Scott, and Jessica
       were staying at Scott's father's house. Scott left. Defendant and
13         Jessica were drinking and got into an argument. During the
       argument, defendant broke a radio because he was angry at Jessica
14         and put a hole in the door. Scott's father, Edwin Verry, heard
       defendant and Jessica yelling and arguing. Defendant came into the
15         house, kicked Verry's dog and grabbed a hammer. He ran back
       outside toward Jessica with the hammer held in an upright, cocked
16         and threatening position. In an angry loud voice, defendant said,
       "You fucking bitch." [Footnote 1.] Jessica was backing away from
17         defendant. Verry yelled at defendant to put the hammer down and
       calm down. Defendant stopped about five feet from Jessica.

18              [Footnote 1: In the police report, Verry told Detective Dan
           Blair defendant said, "I'll kill you, bitch," while holding the
19              hammer.  However, this statement was not admitted into
           evidence.]
20

21         Verry called Scott and told him that because of their behavior,
       specifically the fighting, kicking his dog, and defendant's chasing
22         Jessica, defendant and Jessica were not welcome to stay at his
       home. While he was on the phone Verry heard defendant say, "I'm
23         going to stab you." When Verry asked defendant who he was going
       to stab, defendant answered, "Scott." Verry told defendant he was
24         not going to stab anyone and to sit down. Verry tried to diffuse the
       situation and calm defendant down. Scott and his girlfriend,
25         Danielle Nielsen and another friend, Robert Combs, came to the
       house. The group went to work helping Verry dig an irrigation
26         trench. Jessica and defendant were arguing the entire time.

27         Danielle took Jessica into town to get some food and noticed a
       bruise on her neck. She asked Jessica about the bruise, and Jessica
28         told her that defendant had choked her and slammed her to the
       ground.

4

After Danielle and Jessica returned, Scott, Robert, defendant and Jessica drank alcohol and smoked marijuana. Defendant and Scott also took a Xanax. Later, defendant and Jessica were in the guest house and Danielle heard them arguing and screaming. Defendant was using a "vicious" tone of voice and grabbing Jessica. Jessica came out and asked Danielle to get her away from the house. They got into Danielle's car and tried to leave, but defendant ran out and punched out the passenger door window. Glass hit Danielle in the face and cut her lip. Danielle and Jessica fled from the car and defendant got in and drove off. Scott ran after him and defendant turned the car around, drove back toward the house and Scott. Scott had to jump out of the way to avoid being hit by the car. Defendant then crashed the car into a tree.

Defendant got out of the car. He and Scott wrestled briefly, then defendant ran off, screaming "I'm going to kill you" at everyone. Scott went into the house and armed himself with a machete. Defendant picked up a shovel and yelled, "Where the fuck is she? I'll fucking kill you." Defendant ran at Scott, swinging the shovel. Scott knocked defendant down and defendant gave up the fight.

PROCEDURAL HISTORY

Defendant was charged with making a criminal threat against Jessica in December 2010 [footnote 2] (Pen.Code, § 422), [Footnote 3] three counts of assault with a deadly weapon (id., § 245, subd. (a)(1)), four counts of making criminal threats (id., § 422), cruelly beating a dog (id., § 597, subd. (b)), carjacking (id., § 215, subd. (a)), vehicle theft (Veh. Code, § 10851) and vandalism (Pen. Code, § 594, subd. (a)). One of the assault charges was as against Jessica with the hammer (count I), one against Jessica with a shovel (count II), and one against Scott with the shovel (count III)). The criminal threats charges were against Jessica (count IV), Verry (count V), Scott (count VI) and Danielle (count VII).

> [Footnote 2:  This count was charged in case No. 10NCR08513, which was consolidated with case No. 11NCR08683.]

> [Footnote 3:  undesignated statutory references are to the Penal Code.]

At the close of the prosecution's case, defendant made a motion for acquittal (§ 1118.1) as to the criminal threats against Jessica with the hammer, the criminal threats against Verry, and beating the dog. In response, the prosecution argued Verry had testified that defendant approached Jessica with the hammer raised in an aggressive position and she retreated from him, and that Verry testified defendant had "shouted something along the lines of 'I'll kill or fuck you, I'll kill you.' ... And those words, his motions, and the way the defendant was holding the hammer, convey a threat ...." Defense counsel argued Jessica did not hear a threat or see defendant with the hammer, thus no threat was communicated. The court granted the motion as to the threat to Verry (count V) and beating the dog (count VIII), but denied the motion as to threat to

1

Jessica. No additional prosecution evidence was put forward after the motion.

2

3

At closing argument, the prosecution repeatedly argued, without objection, that Verry had testified that defendant threatened Jessica by stating, "I'll kill you" as he came toward her with the hammer. Defense counsel again argued there was insufficient evidence Jessica heard the threat.

4

5

6

The jury found defendant guilty of the December 2010 criminal threat against Jessica, assault with a deadly weapon against Scott with the shovel, simple assault as a lesser included offense against Jessica, criminal threats against Jessica, Scott and Danielle, vehicle theft and vandalism. The jury found defendant not guilty of assault with a deadly weapon against Jessica with the shovel and carjacking. The trial court suspended imposition of sentence and granted defendant probation. Various fines and fees were imposed, including a court facilities fee (Gov. Code, § 70373) "on every count." The clerk's probation minute order reflects the imposition of a court facility fee of $280.

7

8

9

10

11

12

(ECF No. 24-1 at 3-6.)

13

IV.   Claim 1:  Insufficient Evidence

14

A.   Federal Standard of Review

15

The law on sufficiency of the evidence is clearly established by the United States Supreme

16

Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S.

17

307 (1979), the test on habeas review to determine whether a factual finding is fairly supported by

18

the record is as follows:  "[W]hether, after viewing the evidence in the light most favorable to the

19

prosecution, any rational trier of fact could have found the essential elements of the crime beyond

20

a reasonable doubt."  Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781

21

(1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a

22

reasonable doubt will a petitioner be entitled to habeas relief.  Jackson, 443 U.S. at 324.

23

Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n.16.

24

If confronted by a record that supports conflicting inferences, a federal habeas court "must

25

presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any

26

such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326.

27

Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

28

conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In applying the AEDPA's deferential standard of review, this court must presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

> makes clear that it is the responsibility of the jury—not the court— to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 2.

B.  Discussion

In claim 1, petitioner alleges that there was insufficient evidence to support his conviction for making criminal threats against victim Jessica in March 2011.  Petitioner raised this claim in his appeal to the California Court of Appeal.  The California Court of Appeal is the last state court to issue a reasoned decision addressing this claim.  (See ECF No. 24-1.)  Accordingly, the undersigned gives AEDPA deference to the opinion of the state appellate court regarding this claim.[1]

---

[1]  Petitioner did not file a petition for review with the California Supreme Court after the California Court of Appeal upheld his conviction.  Petitioner filed a habeas corpus petition in the Glenn County Superior Court raising the insufficiency of evidence claim raised on direct appeal and in claim one.  (Respondent's Lodged Document 6.)  Citing In re Waltreus, 62 Cal.2d 218, 225 (1965), and In re Harris, 5 Cal.4th 813, 828 (1993), the Glenn County Superior Court denied this claim on grounds that because the claim was rejected on appeal, it was not cognizable on habeas corpus.  (ECF No. 24-1 at 16.)  Petitioner raised this claim in habeas petitions filed in the

1      The California Court of Appeal denied this claim for the reasons stated herein:

2
3          Defendant contends there was insufficient evidence to support his
           conviction for making criminal threats to Jessica when he ran at her
           with the hammer and said, "You fucking bitch." He also contends
4          the trial court erred in denying his motion under section 1118.1 to
           dismiss that charge on the same alleged lack of evidence. His
5          specific complaint is that the evidence that defendant "approached
           Jessica holding a hammer and stated in a loud voice 'You fucking
6          bitch'" is not sufficient "to show that [defendant] verbally
           communicated a threat that would result in death or great bodily
7          injury to Jessica." Defendant substantially understates the evidence.

8          In ruling on a motion for judgment of acquittal under section
           1118.1, the trial court applies the same standard as an appellate
9          court in reviewing the sufficiency of the evidence to support a
           conviction. On appeal, we independently review the trial court's
10         section 1118.1 ruling to determine whether the evidence was
           sufficient when the motion was made to support a conviction.
11         (People v. Whalen (2013) 56 Cal.4th 1, 55.) Thus, as to both of
           defendant's claims regarding the criminal threats charge, "we
12         review the entire record in a light most favorable to the judgment to
           determine whether it discloses substantial evidence." (People v.
13         Cole (2004) 33 Cal.4th 1158, 1223–1224.) "Substantial evidence is
           defined as 'evidence that is reasonable, credible, and of solid
14         value—from which a reasonable trier of fact could have found the
           defendant guilty beyond a reasonable doubt.' " (People v. Whalen,
15         supra, 56 Cal.4th at p. 55.)

16         "[T]o prove the offense of making criminal threats under section
           422 [,] [t]he prosecution must prove '(1) that the defendant
17         "willfully threaten [ed] to commit a crime which will result in death
           or great bodily injury to another person," (2) that the defendant
18         made the threat "with the specific intent that the statement ... is to
           be taken as a threat, even if there is no intent of actually carrying it
19         out," (3) that the threat ... was "on its face and under the
           circumstances in which it [was] made, ... so unequivocal,

20
_____

21   California Court of Appeal and California Supreme Court. (Respondent's Lodged Documents 7,
     9.) The California Court of Appeal and California Supreme Court denied these petitions without
22   comment or citation. (Respondent's Lodged Documents 8, 10.)

23          California's Waltreus rule holds that "any issue that was actually raised and rejected on
     appeal cannot be renewed in a petition for a writ of habeas corpus." In re Harris, 5 Cal.4th 813,
24   828. A Waltreus denial is neither a ruling of procedural default nor a ruling on the merits. Carter
     v. Giurino, 385 F.3d 1194, 1198 (9th Cir. 2004). Thus, the California Court of Appeal's decision
25   on direct appeal constitutes the relevant state court adjudication on the merits for purposes of the
     AEDPA standard of review. See Cannedy v. Adams, 706 F.3d 1148, 1159 (9th Cir. 2014) (noting
26   that federal courts look through summary denials to the last reasoned state court decision, whether
     those denials are on the merits or denials of discretionary review); see also Ylst v. Nunnemaker,
27   501 U.S. 797, 805 (1991) (looking through a denial based on Waltreus to the last explained state
     court opinion).

28

unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.' " (In re George T. (2004) 33 Cal.4th 620, 630.) Defendant's sole challenge to the sufficiency of the evidence is as to the first element, whether he made a threat to commit a crime that would result in bodily injury or death to Jessica.

"[S]ection 422 requires that the communication must be sufficient 'on its face and under the circumstances in which it is made' to constitute a criminal threat." (In re Ryan D. (2002) 100 Cal.App.4th 854, 860.) Threats are judged in their context and not solely on the specific words spoken. (People v. Solis (2001) 90 Cal.App.4th 1002, 1014.) Where words, conduct, and gestures occur as part of a continuous incident, we analyze them together to assess the threat communicated. When the language used is ambiguous, we also consider the defendant's mannerisms and affect, and the actions involved in making the threat as well as subsequent actions taken by the defendant. (Solis, at p. 1013; People v. Franz (2001) 88 Cal.App.4th 1426, 1442, 1446.) In addition, we consider the prior relationship and history between the parties. (In re Ricky T. (2001) 87 Cal.App.4th 1132, 1137–1138; People v. Mendoza (1997) 59 Cal.App.4th 1333, 1340.) "A communication that is ambiguous on its face may nonetheless be found to be a criminal threat if the surrounding circumstances clarify the communication's meaning." (In re George T., supra, 33 Cal.4th at p. 635.)

The words "You fucking bitch" standing alone and considered in a vacuum do not establish a criminal threat. But those words are not all there is to this case.

Approximately three months prior to running at her with the hammer, defendant had been drinking and got into an argument with Jessica. During that argument he was destructive of personal property, retrieved a metal bar, raised it in a threatening manner, threatened to break down a door and kill Jessica. A few days before the fight at Verry's home, defendant choked Jessica and slammed her to the ground. At the Verrys', defendant was again drinking and fighting with Jessica. He was destructive of personal property, damaged a door and then retrieved a hammer. He ran toward Jessica holding the hammer, upright, in a cocked and threatening position and angrily yelled at her "You fucking bitch." After more drinking and taking drugs, Jessica and defendant continued arguing, while defendant grabbed her and used a "vicious" tone of voice. As Jessica tried to leave, defendant charged the car and punched out the car door window. He then drove the car directly at Scott. When he got out of the car, he picked up a shovel and screamed, "I'm going to kill you," "Where the fuck is she? I'll fucking kill you" at everyone. Defendant and Jessica argued through the entire incident. Thus, in addition to the words, in this case there are: threatening gestures with a hammer; a relationship with prior threats and violence; a previous incident involving similar circumstances of

intoxication, property destruction and a threat while brandishing a metal tool; and, subsequently escalating threats and violence directed at Jessica and others trying to help her. These surrounding circumstances provide a context that clarifies the meaning of defendant's words and makes clear they were indeed a threat. This is sufficient evidence to support a conviction for criminal threats and the trial court properly denied the motion for acquittal. [Footnote 4.]

> [Footnote 4: as defendant notes, the record reflects that the parties apparently mistakenly believed Verry had testified at trial consistent with his statement to police officers, that defendant shouted at Jessica, "I'll kill you." Defendant contends although the jurors "may have remembered [the testimony] differently …. [they] also mistakenly believed that the record contained … evidence that [defendant] stated, 'I'll kill you.'" Defendant provides no evidence of such confusion or mistake by the jury and makes no claim of either prosecutorial or juror misconduct. The trial court instructed the jury pursuant to CALCRIM Nos. 104, 200, and 222 that the jury was to decide the facts of the case based only on the evidence, that the attorneys' statements were not evidence, that the jury must follow the law as given by the court and ignore contradictory statements by the attorneys and that the jury could ask for the court reporter's transcript to read back if it felt that was necessary to resolve any conflicts or confusion. We presume the jury relied on these instructions, not the attorneys' arguments, in convicting defendant. Furthermore, we presume "'the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.'" (People v. Morales (2001) 25 Cal.4th 34, 47, quoting People v. Sanchez (1995) 12 Cal.4th 1, 70.)

(ECF No. 24-1 at 6-8.)

The California Court of Appeal's finding that there was sufficient evidence to support petitioner's conviction for making criminal threats against victim Jessica in March 2011 was not an unreasonable application of clearly established Supreme Court authority. As noted by the state court of appeal, petitioner's statement "you fucking bitch," standing alone, was insufficient to establish a criminal threat. However, this statement, combined with petitioner's threatening gestures with the hammer as well as his prior threats to Jessica, were adequate evidence to support the jury's finding that he threatened to commit a crime that would result in death or great bodily injury to Jessica. In other words, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a

1    reasonable doubt.  Accordingly, this claim is denied.

2    V. Claims 2, 3, 4, 5, 6, 7:  Procedural Default

3         Respondent argues that claims 2, 3, 4, 5, 6 and 7 are procedurally defaulted.

4         In claim 2, petitioner alleges that his convictions based on the March 2011 incident are

5    based on perjury.  (ECF No. 1 at 17-26.)  In claim 3, petitioner alleges that law enforcement

6    tampered with evidence.  (Id. at 27-29.)  In claim 4, petitioner alleges that there was insufficient

7    evidence to support his conviction for making criminal threats against Jessica in December 2010.

8    (Id. at 31-33.)  In claim 5, petitioner argues that Jessica was not credible due to her "state of

9    mind."  (Id. at 35-36.)  In claim 6, petitioner alleges that his conviction for making criminal

10   threats against Jessica in December 2010 should be reversed because it is based on hearsay only.

11   (Id. at 38.)

12        In claim 7, petitioner alleges that his conviction for making criminal threats against

13   Jessica in December 2010 should be reversed because of Jessica's inconsistent testimony.  (Id. at

14   39-42.)  Petitioner also alleges that his conviction for making criminal threats against victim

15   Danielle in March 2011 should be reversed because of Danielle's inconsistent statements.  (Id. at

16   42-43.)  Additionally, petitioner argues that Danielle committed perjury.  (Id.)  Petitioner also

17   argues that Scott committed perjury so that his convictions for making criminal threats in March

18   2011 as well as his conviction for assault with a deadly weapon must be reversed.  (Id. at 43-46.)

19        The procedural default doctrine forecloses federal review of a state prisoner's federal

20   habeas claims if those claims were defaulted in state court pursuant to an independent and

21   adequate state procedural rule.  See Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).

22   Generally, "federal habeas relief will be unavailable when (1) 'a state court [has] declined to

23   address a prisoner's federal claims because the prisoner had failed to meet a state procedural

24   requirement,' and (2) 'the state judgment rests on independent and adequate state procedural

25   grounds.'"  Walker v. Martin, 562 U.S. 307, 316 (2011) (quoting Coleman, 501 U.S. at 729-30).

26   A state procedural rule is "adequate" only if it is clear, consistently applied, and well established

27   at the time of petitioner's default.  Walker, 562 U.S. at 316.  The respondent bears the burden of

28   proof with respect to the "adequacy" of a state procedural bar.  Bennett v. Mueller, 322 F.3d 573,

1   585-86 (9th Cir. 2003). "[A] procedural default does not bar consideration of a federal claim on

2   either direct or habeas review unless the last state court rendering a judgment in the case 'clearly

3   and expressly' states that its judgment rests on a state procedural bar." <u>Harris v. Reed</u>, 489 U.S.

4   255, 263 (1989).

5       When a state prisoner has defaulted on his federal claim in state court pursuant to an

6   independent and adequate state procedural rule, federal habeas review of the claim is barred

7   unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

8   alleged violation of federal law, or demonstrate that failure to consider the claims will result in a

9   fundamental miscarriage of justice. <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991).

10       Petitioner raised claims 2-7 in his habeas corpus petition filed in the Glenn County

11  Superior Court. (Respondent's Lodged Document 6.) The Glenn County Superior Court is the

12  last state court to issue a reasoned decision addressing these claims. (Respondent's Lodged

13  Documents 8, 10.) "Where there has been one reasoned state judgment rejecting a federal claim,

14  later unexplained orders upholding that judgment or rejecting the same claim rest upon the same

15  ground." <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991). Accordingly, this court looks through

16  the summary denials by the California Supreme Court and California Court of Appeal to the

17  Glenn County Superior Court's decision.

18       The Superior Court denied these claim on grounds that they should have been raised on

19  appeal:

20          Claims that could have been raised on appeal are not cognizable on
            habeas corpus unless the petitioner can show that (1) clear and
21          fundamental constitutional error strikes at the heart of the trial
            process; (2) the court lacked fundamental jurisdiction; (3) the court
22          acted in excess of jurisdiction not requiring a redetermination of
            facts; or (4) a change in law after the appeal affected the petitioner.
23          (<u>In re Dixon</u> (1953) 41 Cal.2d 756, 759; <u>In re Harris</u> (1993) 5
            Cal.4th 813, 828.)
24
25          Petitioner makes multiple claims of error that are based on facts that
            were in the record. Accordingly, those issues could have been
26          raised on appeal. Those claims include: there was conflicting
            evidence about the presence, location and use of the shovel; there
27          was insufficient evidence of the criminal threat against Jessica A. in
            2010; Jessica A.'s testimony was not credible; and hearsay
28          evidence was introduced. As Petitioner could and should have
            raised these issues on appeal, but did not do so, the claims are now

> barred by <u>Dixon</u>.  Again, to the extent that Petitioner claim that appellate counsel was ineffective for failing to raise these claims on appeal, that issue is addressed below.

(ECF No. 24-1 at 16-17.)

As indicated above, the Superior Court rejected claims 2-7 because they should have been raised on appeal.  However, the Superior Court went on to find that petitioner's appellate counsel was *not* ineffective for failing to raise these claims on appeal because these claims were *not* appropriately raised on appeal:

> In addition, Petitioner argues that appellate counsel should have raised additional claims on direct appeal:  there was conflicting evidence about the presence, location and use of the shovel; there was insufficient evidence of the criminal threat against Jessica A. in 2010;  Jessica A.'s testimony was not credible; and hearsay evidence was introduced.  However, questions of fact, such as evaluating conflicting evidence and determining the credibility of witnesses, are matters that generally cannot be raised on appeal. (See <u>People v. Jones</u> (2013) 57 Cal.4th 899, 963 ["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact."].)

(<u>Id.</u> at 19-20.)

A reviewing court need not invariably resolve the question of procedural default prior to ruling on the merits of a claim.  <u>Lambrix v. Singletary</u>, 520 U.S. 518, 524-25 (1997).  Where deciding the merits of a claim proves to be less complicated and less time-consuming than adjudicating the issue of procedural default, a court may exercise discretion in its management of the case to reject the claim on the merits and forgo an analysis of procedural default.  <u>See</u> <u>Franklin v. Johnson</u>, 290 F.3d 1223, 1232 (9th Cir. 2002):  ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same"); <u>Busby v. Dretke</u>, 359 F.3d 708, 720 (5th Cir. 2004) (noting that although the question of procedural default should ordinarily be considered first, a reviewing court need not do so invariably, especially when the issue turns on difficult questions of state law).

Under the circumstances presented here, i.e., the potentially conflicting rulings by the Glenn County Superior Court regarding whether these claims should have been raised on appeal or habeas, the undersigned finds that claims 2-7 can be more easily resolved on the merits.

13

1   Accordingly, the undersigned will assume that these claims are not defaulted and address them on

2   the merits.

3   VI.  Claim 2:  Alleged Perjury

4        A.  Legal Standard

5        "[T]he [Supreme] Court has consistently held that a conviction obtained by the knowing

6   use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable

7   likelihood that the false testimony could have affected the judgment of the jury."  United States v.

8   Agurs, 427 U.S. 97, 103 (1976) (footnotes omitted).  The essential elements of such successful

9   claim are that (1) the testimony is false or perjured, (2) the prosecutor knew that the testimony

10  was false or perjured, and (3) the false testimony was material.  Hayes v. Brown, 399 F.3d 972,

11  984 (9th Cir. 2005) (en banc); see Napue v. Illinois, 360 U.S. 264, 269 (1959); Murtishaw v.

12  Woodford, 255 F.3d 926, 959 (9th Cir. 2001).

13       A witness testifying under oath commits perjury if she "gives false testimony concerning a

14  material matter with the willful intent to provide false testimony, rather than as a result of

15  confusion, mistake, or faulty memory."  United States v. Dunnigan, 507 U.S. 87, 94 (1993).  Not

16  every discrepancy in testimony translates into perjury.  Lambert v. Blackwell, 387 F.3d 210, 249

17  (3d Cir. 2004).  Falsity is not established merely by showing that the witness made an earlier

18  inconsistent statement, or that the witness's testimony differs from that of another witness.  See

19  United States v. Zuno–Arce, 44 F.3d 1420, 1423 (9th Cir. 1995).  "Discrepancies in testimony

20  …could as easily flow from errors in recollection as from lies."  Id.

21       B.  Background

22       In claim 2, petitioner alleges that Scott, Robert and Danielle committed perjury when they

23  testified that petitioner picked up a shovel and threatened Scott during the March 2011 incident.

24  Petitioner was found guilty of assault with a deadly weapon based on the evidence that he

25  assaulted Scott with a shovel.  (See CT at 75.)

26       Petitioner argues that Scott, Robert and Danielle lied when they testified that petitioner

27  picked up the shovel because they were trying to protect Scott from being prosecuted for

28  assaulting petitioner with the machete.  In support of claim 2, petitioner includes approximately

1    nine pages of briefing, detailing the alleged perjury.  (See ECF No. 1 at 17-26.)  The undersigned
2    summarizes the relevant evidence herein.

3        *Danielle's Testimony*

4        At trial, Danielle testified that after petitioner took her car, Scott chased the car down the
5    road.  (RT at 84.)  Danielle then started to go to the back door of the house because she knew the
6    front door was locked.  (Id. at 87.)  After petitioner crashed her car, Danielle turned around and
7    went to go back to her car.  (Id. at 88.)  Danielle testified that she saw petitioner pick up a shovel
8    between the back house and the front house.  (Id.)  When petitioner picked up the shovel,
9    Danielle was in front of the house.  (Id. at 91.)  At that time, petitioner held the shovel up and
10   said, "Where the fuck is she?  I'll fucking kill you."  (Id.)  Danielle started running to the back
11   door, where Robert was located.  (Id. at 92.)  Danielle testified that Robert had gotten the back
12   door open.  (Id.)  Danielle then went inside the house.  (Id. at 93.)  She then called 911.  (Id.)  On
13   cross-examination, Danielle testified that she stayed inside the house until the police arrived.  (Id.
14   at 118.)  However, she opened the front door after calling 911 and said that "they were coming."
15   (Id.)  At that point, Scott was on the front porch kind of on the ground and he was holding a towel
16   on petitioner's neck.  (Id.)

17       On cross-examination, Danielle admitted that when she spoke with Deputy Ross on the
18   night of the incident, she did not mention anything about petitioner having a shovel.  (Id. at 119.)
19   On cross-examination, Danielle testified that when petitioner confronted her with the shovel, she
20   did not know where Robert was.  (Id. at 120.)  She also testified that Scott was her boyfriend at
21   the time of the incident.  (Id.)

22       *Scott's Testimony*

23       Scott testified that after petitioner crashed the car, petitioner fled the vehicle and went
24   around the back of both houses.  (Id. at 135.)  Scott then went into the front house because he
25   (Scott) was "looking for Danielle or something to protect myself with because I heard shouting
26   'I'm going to kill you…'"  (Id. at 135.)  Scott grabbed a machete.  (Id. at 136.)  Scott testified that
27   he heard either Robert or Danielle yelling, "He has a shovel."  (Id. at 138.)  Scott then went to the
28   side of the front house and looked in the back of the orchard.  (Id. at 137.)  Scott saw petitioner

1    standing with the shovel raised over his head "running after us." (Id.)  Petitioner was holding the

2    shovel in a "combative stance.  Like getting ready to swing." (Id. at 140.)

3         Scott testified that when petitioner began running toward Scott, Robert was either right

4    next to Scott or behind Scott. (Id. at 141.)  Scott and Robert began running toward the front door

5    of the front house. (Id.)  As he ran, Scott heard the shovel swing. (Id.)  Scott heard the shovel hit

6    a pole. (Id.)  Scott then hit petitioner with the machete. (Id. at 142.)

7         On cross-examination, Scott testified that he had been in the Marines for three years. (Id.

8    at 151.)  Scott testified that his Military Occupation Specialty was 0311 infantry. (Id. at 152.)  He

9    testified that he had trained in hand to hand combat while in the Marines. (Id. at 152-53.)  Scott

10   testified that petitioner dropped the shovel after Scott hit him with the machete. (Id. at 171.)

11        On cross-examination, Scott was asked regarding his conversation with Deputy Ross on

12   the night of the incident. (Id. at 172.)  Scott told Deputy Ross that he did not remember much

13   about what happened because he had a blackout. (Id.)  Scott testified that he blacked out after it

14   got "real violent." (Id.)  Scott recalled hitting petitioner three times with a machete around the

15   head and the shoulders. (Id. at 173.)  Scott did not recall telling Deputy Ross that he did not

16   recall anybody having any weapons. (Id.)  When asked if he remembered that he did not tell

17   Deputy Ross that petitioner had a shovel, Scott testified, "I think I did, but I can't recall at this

18   time.  I don't remember everything I said to him." (Id. at 174.)

19        Scott testified on cross-examination that after making his statement to Deputy Ross, Scott

20   was placed under arrest for using the machete on petitioner and taken to jail. (Id.)

21        Scott testified that at some point during the incident, he saw Danielle with a cut lip and he

22   thought that petitioner had punched her in the face. (Id. at 175.)  Scott admitted that he was angry

23   at petitioner for doing that. (Id.)  Scott also testified that when Robert went outside with him after

24   he got a machete, Robert had a little cardboard broom. (Id. at 176.)  Scott was asked if he

25   remembered telling Deputy Ross that after petitioner slammed the car into the tree, Scott actually

26   got a hold of petitioner at some point, wrestled him to the ground but he got away. (Id. at 178-

27   79.)  Scott testified that those things did happen. (Id. at 178-79.)

28   ////

1     *Robert's Testimony*

2        Robert testified that after petitioner got in Danielle's car, she ran inside the house.  (Id. at

3 199.)  After petitioner drove away, Robert went inside the house to see if Danielle was alright.

4 (Id. at 199.)  Scott soon came inside the house and said, "Somebody needs to call the cops right

5 away."  (Id. at 200.)  Danielle called the cops and Scott ran back outside.  (Id.)  Robert heard a

6 crash.  (Id.)  Robert then ran out the back door and saw petitioner running toward the orchard.

7 (Id.)  Robert went back inside and locked the door.  (Id.)  Scott was already in the house getting

8 the machete.  (Id. at 200-01.)  Scott went out the front door and Robert followed him.  (Id.)

9 Robert testified that when he left the house, he did not grab anything.  (Id. at 201.)

10        Robert testified that after a while, he saw petitioner coming out of the orchard carrying a

11 shovel.  (Id.)  As petitioner walked toward Robert and Scott, Robert heard him say, "Where is

12 Jessica at?  Is she inside the house?"  (Id.)  Robert told petitioner that Jessica was not there and

13 that she had run through the orchard.  (Id.)  Petitioner said, "You're lying.  Where is Jessica at?"

14 (Id.)  At that point, Robert and Scott started backing up.  (Id.)  Robert backed up because he was

15 scared that he was going to get hit.  (Id. at 201-02.)  Petitioner then went after Scott, jabbing the

16 shovel toward him.  (Id. at 202.)  Scott swung the machete and petitioner fell.  (Id.)

17        On cross-examination, Robert testified that on the night of the incident, he told Deputy

18 Ross that he did not recall seeing any weapons used by anybody.  (Id. at 207.)  Robert testified

19 that he told Deputy Ross that he was not present when the confrontation took place between

20 petitioner and Scott.  (Id.)

21        On re-direct examination, Robert testified that approximately one and a half weeks after

22 the incident, he told Detective Blair that petitioner came at him and Scott with a shovel.  (Id. at

23 208.)  On re-cross examination, Robert testified that when he made the statement to Detective

24 Blair, Robert was concerned that Scott had been arrested for using a machete on petitioner.  (Id. at

25 209.)

26 ////

27 ////

28 ////

On re-cross examination, Robert testified that before Scott got the machete, neither he (Robert) nor Danielle said anything about, "He's got a shovel.  He's going to kill us."  (Id. at 215.)  Robert testified that he picked up a broom stick before he went outside.  (Id.)  Robert testified that while Danielle was in the house, she did not say anything about petitioner having a shovel.  (Id. at 216.)

*Ed Veery's Testimony*

Ed Veery testified that on March 4, 2011, he saw petitioner pick up a hammer by the door and go back outside toward Jessica.  (Id. at 222.)  Ed Veery testified that as petitioner went out the back door with the hammer, "he was like 'you fucking bitch,' or said something like that towards Jessica…"  (Id. at 224.)  Ed Veery later called his son, Scott, and asked him to come and take petitioner and Jessica away.  (Id. at 228.)  While he was on the phone with Scott, petitioner said to Ed Veery, "I'm going to stab you."  (Id.)  When Ed Veery hung up the phone, he asked petitioner who he was going to stab.  (Id. at 229.)  Petitioner responded, "Scott."  (Id.)  Ed Veery responded, "You ain't going to stab nobody.  Sit down."  (Id.)

*Jessica's Testimony*

Jessica did not see the incident involving the shovel and machete because she fled through the orchard.  (Id. at 264-65.)

Jessica testified about the December 12, 2010 incident involving petitioner.  Jessica testified that she called her parents and asked them to call 911 because petitioner had picked up a metal bar.  (Id. at 268.)  Jessica went into her parent's home and locked the door.  (Id.)

The courtroom clerk read into the record a statement written by Jessica at the time of the incident.  (Id. at 272-73.)

> Me and Dylan got in an argument earlier in the night. He came back drunk and started acting out when I asked him to leave. He started throwing our stuff out of the truck saying if I left him he would kill me. I told him I did not want to be with him anymore and that he needed to leave and that I was calling 911 and they would get him for drunk in public. He then stated he would kick the door in and kill me before the coups could get there. Then I shut the door and locked it and told my parents to call 911. I looked out the window and saw him walking toward Sportsman's. I am in fear for my safety. Dylan is mentally unstable. When he snaps he doesn't come out of it easily. When he said he was going to kill me before

1    the police arrived he had a steel bar in his hand waiving it.

2  (Id.)

3       *Officer Barnes' Testimony*

4       During the testimony of Officer Barnes, the statement of Jessica's father taken following

5  the December 12, 2010 incident was read into the record:

6           I heard arguing outside my home.  My daughter was at the door and
            Dylan Corral was in the road next to his truck throwing things to
7           the ground.  I yelled at him, "What's going on?"  He pulled a metal
            rod out of the back of the truck and raised it in a threatening
8           manner.  I came in and my wife called the police.

9  (Id. at 299.)

10      *Detective Felton's Testimony*

11      Detective Felton testified that he interviewed Scott following the March 4, 2011 incident.

12 (Id. at 320-21.)  Detective Felton did not testify exactly when this interview took place.

13 However, based on his testimony, it appears that this interview occurred on March 4, 2011, after

14 Scott was taken into custody.  (Id. at 321-25.)

15      Detective Felton testified that during this interview, Scott did not mention a shovel.  (Id. at

16 323.)  Scott did state that petitioner had driven the car and almost run over him.  (Id.)  Scott told

17 Detective Felton that he went and got the machete after this incident.  (Id.)  Scott admitted to

18 Detective Felton that he had picked up the wrong weapon to use.  (Id.)  Scott told Detective

19 Felton that he thought the machete was the only thing available to him.  (Id.)  Scott admitted that

20 he could have grabbed something outside of the residence to use as a weapon.  (Id.)

21      Scott told Detective Felton that petitioner was yelling at everybody that he was going to

22 stab someone or kill someone, but Scott had no intention of killing petitioner.  (Id. at 324.)

23      Detective Felton testified that on March 4, 2011, no one who was at the residence where

24 the incident occurred (i.e., Jessica, Danielle, Robert or Scott) said that petitioner had a shovel that

25 he was going to use on one of them that night.  (Id. at 326.)  Detective Felton testified that

26 petitioner's use of a shovel came up in later interviews.  (Id.)

27      Detective Felton testified that the first mention of petitioner using a shovel occurred

28 during interviews that took place on March 16, 2011.  (Id.)  However, he later testified that Scott

19

1   told Detective Blair during an interview conducted on the night of the incident that petitioner

2   came at him with a shovel.  (RT at 328-29.)

3       *Deputy Ross's Testimony*

4       Deputy Ross testified that on the night of the March 4, 2011, he spoke with Scott.  (<u>Id.</u> at

5   333.)  At that time, Scott did not say that petitioner had a shovel.  (<u>Id.</u>)  Deputy Ross also spoke

6   with Robert on the night of the incident.  (<u>Id.</u>)  Robert did not say that petitioner had a shovel.

7   (<u>Id.</u>)  Robert told Deputy Ross that he did not see anyone with a weapon.  (<u>Id.</u> at 333-34.)  Robert

8   told Deputy Ross that he was not present when petitioner was injured.  (<u>Id.</u> at 334.)  Robert told

9   Deputy Ross that when he came out of the house, Scott was on top of petitioner and petitioner

10  was bleeding.  (<u>Id.</u>)

11      *Petitioner's Testimony*

12      Regarding the December 2010 incident, petitioner denied threatening Jessica with the

13  metal bar.  (<u>Id.</u> at 340.)

14      Regarding the March 4, 2011 incident and, in particular, whether he picked up a shovel,

15  petitioner testified that he saw Scott after he got out of Danielle's car .  (<u>Id.</u> at 351.)  Scott was

16  running toward petitioner, coming from the house.  (<u>Id.</u>)  Petitioner saw something in Scott's

17  hand.  (<u>Id.</u>)  Petitioner then ran through the orchard.  (<u>Id.</u>)  A few minutes later, petitioner returned

18  to the house.  (<u>Id.</u>)  As petitioner approached the front of the house, he saw Scott and Robert.  (<u>Id.</u>

19  at 352.)  Petitioner did not have anything in his hands.  (<u>Id.</u> at 353.)  Scott had a machete.  (<u>Id.</u>)

20  Petitioner did not see the machete until Scott struck him with it.  (<u>Id.</u>)  Scott struck him three

21  times, once in the head and twice in the neck.  (<u>Id.</u> at 354.)  Petitioner testified that he was

22  hospitalized for his injuries.  (<u>Id.</u> at 355.)  He suffered nerve damage, a fractured neck and had to

23  have staples. (<u>Id.</u>)

24      Petitioner testified that he had done nothing to threaten Scott.  (<u>Id.</u>)   Petitioner denied

25  threatening anyone on the night of the March 2011 incident.  (<u>Id.</u> at 356-57.)

26      *Petitioner's Exhibits—Ross Report*

27      Petitioner has provided reports of interviews taken following the March 4, 2011 incident.

28  As indicated above, these interviews were discussed at the trial.  Because these reports are

1   relevant to the instant claim, the undersigned discusses the relevant sections of these reports

2   herein.

3       Petitioner has provided the report prepared by Deputy Ross containing the statements he

4   took on the night of the incident.  (ECF No. 1 at 104-07.)  It appears that these statements were

5   the first statements made following the incident by Scott, Robert and Danielle.

6       Scott told Deputy Ross that after petitioner got out of Danielle's car, Scott pushed

7   petitioner to the ground because petitioner was out of control.  (Id. at 105.)  "[Scott] said they

8   fought for a second and [petitioner] got away from him, and then he doesn't remember much after

9   that because he blacked out.  [Scott] says all he remembers is that he had to knock [petitioner] to

10  the ground to try to help him because he could see him bleeding everywhere.  Then the police

11  arrived."  (Id.)

12      Robert told Deputy Ross that, "he doesn't know what happened he just saw [petitioner]

13  and [Scott] getting into it in the front yard.  He said he didn't see any weapons, but when they

14  started fighting he got scared and ran around to the side of the house."  (Id. at 106.)

15      Danielle told Deputy Ross after petitioner took her car, she ran into the house.  (Id. at

16  107.)  The "next thing she knows her car is wrecked in the front of the house and [petitioner] and

17  [Scott] are fighting."  (Id.)  Danielle told Deputy Ross that she never saw any weapons but she

18  was scared so she ran into the house when petitioner was coming back.  (Id.)

19      Deputy Ross wrote that he searched the crime scene for evidence.  (Id.)  He found a round

20  nose shovel with what looked like blood on it located to the west of the front door on the front

21  walkway elevated off the ground on a rack.  (Id.)  He also found a machete in the car port located

22  on the east side of the residence with what looked like blood on it.  (Id.)

23      *Petitioner's Exhibits—Arlin Report*

24      Sergeant Arlin wrote that on March 7, 2011, Danielle contacted him by phone.  (Id. at

25  109.)  Danielle advised Sergeant Arlin that she had more information regarding the March 4,

26  2011 incident.  (Id.)

27      Later that day, Sergeant Allin and Detective Felton interviewed Danielle.  (Id.)  In

28  relevant part, Danielle stated,

21

> [Petitioner] came back with the car and high centered it somewhere by the main house. She told me that [petitioner] got a shovel and came after her. [Petitioner] had the shovel over his shoulder and told [Danielle] "You better tell me where she is or else I'm going to kill you." Later in this interview she told us that [petitioner] had blood on him. She also stated there was blood all over her car. She said it was on the dash and "everywhere." It was not all from her bleeding lip.
>
> [Danielle] was able to get into the house with Robert. She called 911 and tried to explain where they were to the dispatch. She requested an ambulance be sent to the residence.
>
> After a period of time she went outside of the residence and saw Scott on top of [petitioner].
>
> ***
>
> She indicated to me that she never saw the machete but had heard that was the weapon that was used.

(Id. at 109.)

Petitioner has also provided a transcript from this interview. (Id. at 110-29.)

*Petitioner's Exhibits—Blair Report of Scott Interview*

Petitioner also provided a report prepared by Detective Blair of his interview with Scott on March 4, 2015, at 2015 hours, i.e., after Scott had been arrested and was in custody.

In relevant report, the Blair report states,

> [Scott] said [petitioner] turned the car around and sped back towards him. He stated the vehicle was traveling at a high rate of speed. He said [petitioner] swerved the car at him and then crashed into a tree located just south of the driveway.
>
> ***
>
> [Scott] said [petitioner] exited the vehicle and rushed him, attempting to tackle him. He said [petitioner] stated, "Where the fuck is she."
>
> [Scott] said he did not remember anything else because he blacked out and came to when [petitioner] was laying on the ground bleeding.
>
> After continued questioning, [Scott] said he lied and he remembered more of the incident.
>
> [Scott] said after [petitioner] wrecked the car he tried to tackle him, he and [petitioner] became involved in a physical altercation. He said [petitioner] ran into the darkness near the southwest side of the

22

1      residence.

2      [Scott] advised he entered the residence and retrieved a machete and then went back outside.  *He said [petitioner] came out of the*

3      *shadows wielding a shovel.*

4      [Scott] said he blacked out and did not remember anything else.  He said he came to holding [petitioner] down.

5

6      He said he saw [petitioner] was injured and he applied pressure to the wounds using a bandanna or a rag.

7      [Scott] said he has had mental health issues in the past and it is documented that he suffers from black outs.

8

9      (Id. at 145-46 (emphasis added).)

10      *Petitioner's Exhibits—Officer Gallagher Report*

11      Petitioner has provided the report of Officer Gallagher who was one of the first responders

12  to the March 4, 2011 incident.  In his report, he summarizes a statement taken from Danielle by

13  Officer Henriques at the scene.  (Id. at 148-49.)  In relevant part, Danielle stated that after

14  petitioner returned with her car, he "exited the vehicle and an altercation ensued between

15  [petitioner] and [Scott] at which time [petitioner] was struck with a machete."  (Id. at 149.)

16      *Petitioner's Exhibits—Felton Interview Transcript*

17      Detective Felton testified that his interview with Scott on the night of the incident

18  occurred after the interview by Detective Blair:  "Detective Blair questioned him.  Was in the

19  process of questioning him, and I came in later and questioned him further."  (RT at 321.)  It

20  appears that the transcript quoted below is from this interview.[2]

21      The undersigned quotes the relevant portions of the transcript herein.

22      Scott:  …and Patrick, that car and came after me, I, I don't know. That's all I can say.  I just told the other detective, you know like, I

23      sat there and fuckin' bullets, I seen how bit the cut you know because you know flying.  I'm applying the bandana out of my back

24      pocket and a thing to help him out so he doesn't die because it was in a really bad spot. I'm not like, I don't know.

25

26      Felton:  Yeah but the weapon that you had, you understand what that could do to somebody.

27      Scott:  You're right.  I wasn't trying to use it like it was more like

28  [2]  At trial, Detective Felton testified that this was his only interview of Scott.  (RT at 328.)

more of a force of stop dude, you need to freak out, you know, or you need to not freak out.  I don't.

Felton:  You're lucky you didn't cut his head off.

Scott:  I wasn't trying to cut his head off, sir.

Felton:  I know but you…

Scott:  I wasn't trying to cut him at all.

Felton:  I understand but you know that type of weapon, what that weapon can do.

Scott:  Yes but that's all that I, that's all that I could see.  Like I didn't want to get a steak knife and start stabbing people.  I just found something big that was cause he just totaled my girlfriend's car and punched her in the face and everything fuckin' went haywire.

Felton:  Yeah.

Scott:  And now I'm getting arrested for defending everybody but, whatever.  How long do I have to go?

****

Felton:  The thing I don't understand also is that you remember everything about the night except when you were hitting him with a machete, why is that?

Scott:  Because I black out and I did not…

Felton:  You only black out in serious moments?

Scott:  The other deputy said that he thought, yeah, he thought that was whatever but when I'm fighting especially, I, my memory loses.  It was really bad when I was getting kicked out of the military and I don't know.  I'm supposed to be on medication. I was not taking it because I feel I should be able to do it on my own but I don't feel like I went overboard.  I know like the definition of deadly force and you know, and I was just, dude, we were all threatened.

Felton:  You don't think you went overboard?

Scott:  No sir.  I was not trying to kill the man.

Felton:  Holy crap, man.  He's got major head wounds.  His neck. You cut him along his neck, almost cut his head off.  You know how serious that is?

Scott:  Yes, sir.  I know, I know that, I know that.  I was fucked up. I should have grabbed a different thing and I was in a panic, you know?

24

Felton: Right.

Scott:  Maybe if you were there and you could have seen, I don't know if he punched through the window or whatever but glass shattered, the car getting stolen, flip around and then turn around and try to hit me?

Felton:  Did you think about grabbing everybody and running? Getting out of there, calling 9-1-1?

Scott:  We can't run if he's in the vehicle.

Felton:  Sure you can.  He can't make it through the orchard.

Scott:  Sir, this guy is going psycho and I cannot carry well the other girl left, that girl with me and some dude, like we were far from the town and I was pretty sketched out because you know, like, I didn't know what to do.  I didn't want to.

Felton:  How about when he swerved at you?   Did you ever think about calling 9-1-1?

Scott:  It was not enough time, sir.  I would have, yes.  I think, to be honest.

Felton:  That's all I expect, is you to be honest.

Scott:  Yes, I know I'm being recording or something, but like I told her to call the cops cause I didn't know what to do, you know? And I usually don't believe in that but like, she was scared, she was bleeding and I was messed up, that I brought these people to my dad's house and all that happened, you know, so I just wanted to fuckin' make it better, like I said, to Danielle, I know, call the cops, cause her car was…

Felton:  You didn't fear for your life, though did you?

Scott:  Yes.

Felton:  You feared for your life?

Scott:  Yes.

Felton:  How?

Scott:  Because of the threats and screaming and his girlfriend saying that he's going to hurt somebody and I'm not trying to get him in trouble either.

Felton:  No, I understand that.

Scott:  But like, I feared for my life when that car was about to hit me and he's like, "Well, did it hit you?"  I'm like, "I don't know.  I had fast reflexes, you know."   But I know when someone has the intent to fuckin' hurt someone.  You know, and when.

25

Felton:  But at that moment, you got away.  You were clear, away from the car.

Scott:  You're right.  Well, he ran after me.  There was more to it and once he came out of the orchard, *a shovel in his hand*, fuckin' I don't know.  Like I'm telling you.  I'm just like, "Stop dude, stop" and the part where I like a little girl, is we ran.  You know, and I was taught like, fight or flight but I can't run.  There's another girl in the house, someone out there plus he just stole and totaled the car and this is my dad's property.  Like, there's no way I could run and call the cops.  I'm going to have all these fuckin' losers, if you want to call them that, you know like, on my ass, so I was not trying to hurt anyone or do anything.  I was just trying to like keep the situation under control and I also feel that I did the wrong thing but it's just the first thing that was there, you know?

Felton:  Well you had to run inside to get it.  There's so much stuff outside you could have grabbed.

Scott:  I guess so, sir.  But I mean.

Felton:  You live there, right?

Scott:  I mean, it was in the moment, partially and he was running around too and you know that's the only thing that I have.  Everything else is my father's.  You're right, I could have grabbed a stick but I didn't, I don't know.

Felton:  There's plenty of stuff outside.

Scott:  You're absolutely correct.

Felton:  So you had that machete in your mind to run inside and get it?

Scott:  No, I don't know.  I fucked up on that part.  I don't.  I should have never even hung out, or offered them a place to stay in the first place but, you know, weapon of choice, I don't know.  I was taught like the Geneva Convention, don't use anything too harmful, you know?  But I knew that because of the words that were said earlier and…

Felton:  What words were those?  Did he tell you he was going to kill you?

Scott:  Well he's punched my girlfriend, maybe, I'm not sure if he punched the glass.

Felton:  No, he didn't.  It was the glass.

Scott:  There was a broken window.  Um, yeah, basically, and his girlfriend said he's going to stab someone, someone is going to get hurt.

Felton:  But he never had a knife right?

Scott:  I don't know that, sir.  Any other day he did something real stupid, I'm not in his business.  I don't know, she just said it was a huge fight for no fuckin' reason, you know, and I'm like, "Okay, well, hey, I've given you a chance, give me another hug like, "I love you.  I've got to lock the doors because my dad's going to be home and it's not my house, sorry, you guys have back here.  Here's my blanket, here's my dog, I'm going to try to have a good time."  That's it.  Like, honest.

Felton:  Okay, well what you've got to do is trust the legal system.  It's been around for hundreds of years so let it work out, you know?

****

Felton:  But you can't think like an outlaw.  I know you have to because your family.

Scott:  No, I'm not and.

Felton:  I know you didn't.

Scott:  Or hurting him like that bad.  Honestly, if anything, I don't know, I was going to use it to scare him *but once he got the shovel, whether I set it down or it was still in his hand*, because I can be honest with you guys, like….

Felton:  Well he certainly didn't do it to himself.

Scott:  I know that.

****

(Id. at 164-69 (emphasis added).)

*Petitioner's Exhibits—Blair Report of Robert Interview*

Petitioner has provided the transcript from Detective Blair's interview of Robert on March 16, 2011.  Robert told Detective Blair that after petitioner took off in Danielle's car, he went inside to help Danielle.  (Id. at 185.)  Robert then came out the back door and saw petitioner running into the trees, i.e., orchard.  (Id.)  Right after that, Scott came up and told him to call the cops.  (Id. at 186.)  Scott then went out to the crashed car because Danielle had asked him to look for her car keys.  (Id.)  Scott retrieved the keys and brought them into the house.  (Id.)  Then Scott and Robert stood out front, looking around.  (Id.)  Robert had a plastic broomstick, but he dropped it.  (Id.)  Robert then saw petitioner coming at them with a shovel.  (Id.)

As petitioner comes toward them, he says, "Where's Jessica?  Where's Jessica at?  Fuckin' you know."  (Id. at 187.)  Scott says to Robert, "Get the shovel from him."  (Id.)  As

27

1   petitioner comes toward them, Scott and Robert start backing up, and petitioner starts coming at

2   them fast.  (Id.)  Scott and Robert ran on the porch and tried to get in the front door, but it was

3   locked.  (Id.)  Robert turned and stumbled off the porch and bumped into Scott.  (Id.)

4        Robert thought that petitioner was going to throw the shovel at the back of his head, so he

5   was trying to protect his head.  (Id. at 187-88.)  Robert looked back up and saw Scott punching

6   petitioner and then petitioner said, "I'm done."  (Id. at 188.)  Robert did not know that petitioner's

7   neck was bleeding.  (Id.)  At first, Robert did not see how petitioner was wounded.  (Id.)  Later,

8   Robert said that petitioner was trying to shove Scott a little bit with the shovel and "then that's

9   when Scott came in with the machete and sliced him in his neck."  (Id. at 190.)

10       Robert said that Scott swung the machete once then dropped it.  (Id.)  Petitioner was still

11  holding onto the shovel.  (Id.)  Scott then punched petitioner a couple of times.  (Id.)

12       C.  Discussion

13       Petitioner alleges that Scott falsely testified that petitioner attacked him with a shovel in

14  order to justify the machete attack on petitioner.  Petitioner goes on to allege that Robert and

15  Danielle told law enforcement that they saw petitioner with a shovel, contradicting their initial

16  statements they did not see anyone with a weapon, in order to protect Scott.  For the following

17  reasons, the undersigned finds that petitioner's Napue claim alleging that the prosecutor

18  knowingly elicited perjury from Scott, Robert and Danielle regarding the shovel is without merit.

19       The undersigned begins this discussion by making the following observations regarding

20  the trial testimony and interviews transcripts and summaries discussed above.  In their first

21  statements taken immediately after the incident taken by Deputy Ross, neither Danielle, Scott nor

22  Robert stated that petitioner had a shovel.

23       In the interview with Detective Blair, twelve days after the incident, Robert changed his

24  earlier statement.  In the interview with Detective Blair, Robert stated that he saw petitioner come

25  toward him and Scott with the shovel, and then Scott "came in" with the machete after petitioner

26  tried to "shove Scott a little bit with the shovel."  (ECF No. 1 at 190.)  In her March 7, 2011

27  statement to Sergeant Allin and Detective Felton, Danielle stated that petitioner had a shovel and

28  came after her with it after he wrecked her car.  (ECF No. 1 at 109.)

1    The undersigned also observes that Detective Felton testified at trial that the first time

2  anyone mentioned petitioner having a shovel was during interviews conducted on March 16, 2011

3  (RT at 326).  However, petitioner's exhibits demonstrate that Scott told Detective Blair and

4  Detective Felton during the March 4, 2011 interviews, i.e., after he (Scott) was arrested, that

5  petitioner had a shovel and swung it at Scott.  Scott's statements to Detective Felton and

6  Detective Blair regarding petitioner's use of the shovel were consistent with his trial testimony.

7    Scott's initial failure to tell Deputy Ross that petitioner had a shovel does not demonstrate

8  that Scott committed perjury at trial when he testified that petitioner attacked him with a shovel.

9  Scott's testimony regarding petitioner's use of the shovel was consistent with his statements made

10  to Detectives Felton and Blair on the night of the incident.  Mere inconsistencies in testimony do

11  not establish the knowing use of false testimony by a prosecutor.  See Jeremiah Banks v. Fox,

12  2016 WL 3033692 at *9 (C.D. Cal. 2016), citing United States v. Lochmondy, 890 F.2d 817, 822

13  (6th Cir. 1989).  "Moreover, the fact that a witness contradicts herself or changes her story does

14  not establish perjury."  Id., quoting United States v. Lebon, 4 F.3d 1, 2 (1st Cir. 1993); see also

15  Tapia v. Tansy, 926 F.2d 1554, 1563 (10th Cir. 1991) ("Contradictions and changes in a witness's

16  testimony alone do not constitute perjury and do not create an inference, let alone prove, that the

17  prosecutor knowingly presented perjured testimony."); United States v. Brown, 634 F.2d 819, 827

18  (5th Cir. 1981) (to establish prosecutorial misconduct based on knowing use of perjured

19  testimony, "it is not enough that the testimony is challenged by another witness or is inconsistent

20  with prior statements"); U.S. v. Holladay,566 F.2d 1018, 1019 (5th Cir. 1978) ("A prosecution

21  witness who had testified differently in the past was introduced by the prosecution.  It was not

22  improper for the prosecution to offer this testimony.  Presentation of a witness who recants or

23  contradicts his prior testimony is not to be confused with eliciting perjury.  It was for the jury to

24  decide whether or not to credit the witness."); see also United States v. Williams, 547 F.3d 1187,

25  1202 n.13 (9th Cir. 2008) ("Although there were inconsistencies in Penate's testimony, there was

26  no evidence that the government knowingly presented false testimony.... The inconsistencies in

27  Penate's testimony were argued to the jury.").

28  ////

1     For the same reasons, the inconsistencies in Danielle and Robert's testimony and their

2  initial statements to Deputy Ross do not demonstrate that Danielle and Robert committed perjury

3  or that the prosecution knowingly presented false testimony.

4     Furthermore, credibility determinations of witnesses are within the exclusive province of

5  the jury.  See United States v. Goode, 814 F.2d 1353, 1355 (9th Cir. 1987).  In this case, the jury

6  heard evidence regarding the prior inconsistent statements of Scott, Danielle and Robert.  In other

7  words, the prosecutor did not conceal their prior inconsistent statement.  The jury clearly believed

8  the testimony of Scott, Danielle and Robert that petitioner had a shovel and assaulted Scott with

9  it.  Such a determination was entirely reasonable in light of the evidence including the fact that a

10  shovel with blood on it was found at the incident.  In addition, the jury also heard evidence

11  regarding prior incidents where petitioner made threats with weapons.

12     For the reasons discussed above, petitioner's Napue claim is without merit.

13  VII.  Claim 3: Alleged False Evidence/Evidence Tampering

14     In claim 3, petitioner alleges that the prosecutor presented false evidence regarding the

15  location of the shovel found at the scene of the incident.  (ECF No. 1 at 27-29.)  This claim is

16  governed by the same legal standards as claim 2 alleging that the prosecutor knowingly presented

17  perjured testimony.  The undersigned restates this legal standard herein.

18     The Supreme Court has held that "a conviction obtained through use of false evidence,

19  known to be such by representatives of the State" violates the defendant's right to due process.

20  See Napue v. Illinois, 360 U.S. 264, 269 (1959).  In order to prevail on such a due process claim,

21  "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the

22  prosecution knew or should have known that the testimony was actually false, and (3) that the

23  false testimony was material."  See United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir.

24  2003).

25     Petitioner alleges that law enforcement officials tried to frame him by moving the shovel

26  from where it was initially found.  Petitioner also argues that the report prepared by Officer

27  Henriques, who responded to the incident, does not mention the shovel.  In his report, Officer

28  Henriques lists the evidence as "tire marks, shattered glass, damage to the vehicle, blood and a

1  machete." (ECF No. 1 at 154.)

2      Petitioner argues that in the report prepared following the incident, Deputy Ross wrote

3  that he and Sergeant James searched the crime scene for physical evidence.  Deputy Ross and

4  Sergeant James located a "round nose shovel that had a red colored substance consistent with

5  blood on the handle.  The shovel was located to the west of the front door on the front walkway

6  elevated off the ground on a rack." (Id. at 107 (Ross report).)  Deputy Ross wrote that "all items

7  were photographed and booked into evidence for processing." (Id.)

8      Petitioner argues that at trial, the prosecutor presented photographs of the shovel on the

9  ground, i.e., not on a rack as stated in Deputy Ross's report. (Id. at 28.)  Petitioner argues that

10  law enforcement officers moved the shovel to the ground, so that it was consistent with Scott's

11  testimony, in their attempt to frame petitioner. (Id.)  Petitioner argues that the law enforcement

12  officers should have known that Scott was lying about petitioner having a shovel because the only

13  shovel found was on a rack, and not on the ground where Scott testified that petitioner threw the

14  shovel. (Id.)

15      Petitioner's argument that the prosecutor presented false evidence regarding the shovel is

16  without merit for the following reasons.

17      The undersigned is not persuaded by petitioner's argument that Deputy Ross, and other

18  law enforcement officials, tried to frame him by moving the shovel to the ground.  If Deputy Ross

19  was trying to frame petitioner, then it is unclear why he wrote in his report that the shovel was

20  found on a rack, and not on the ground.

21      It does appear that Deputy Ross's description of where the shovel was found, i.e, on a

22  rack, is inconsistent with the location of the shovel in the photograph described by petitioner and

23  witnesses at trial, i.e., on the ground.  However, after reviewing the transcript, it does not appear

24  that the prosecutor used the photograph as evidence of where the shovel was found.  Instead, the

25  prosecutor showed the photograph of the shovel to witnesses so that they could identify the

26  shovel as the shovel used by petitioner.

27      The prosecutor did not ask either Scott or Robert, the two prosecution witnesses who saw

28  the assault, if the photograph depicted where petitioner dropped the shovel.  Instead, the

1  prosecutor asked them if the photograph showed the shovel that petitioner used in the assault.

2  (RT at 137-38, 202.)  On cross-examination, petitioner's counsel asked Scott if he knew how the

3  shovel got in the position it was shown in the photograph.  (RT at 171.)  Scott responded, "No.  I

4  mean, it's kind of under the top of stuff, now that I mention, but I—really, I don't know."  (Id.)

5        On redirect, the prosecutor asked Scott if he could say where defendant dropped the

6  shovel after looking at the photograph of the shovel.  (Id. at 181.)  Scott answered, "No.

7  Honestly, I didn't have anything to do with that.  After he dropped the shovel and I hit him with

8  the machete I went to –"  (Id.)  The prosecutor then went on to show Scott a different photograph

9  showing his father's house and the front yard and the carport.  (Id. at 182.)  The prosecutor asked

10 Scott if he could identify where petitioner dropped the shovel looking at the photograph of the

11 house, yard and carport.  (Id.)

12       The record demonstrates that the prosecution did not use the photograph of the shovel to

13 prove where the shovel was found at the scene of the incident.   Instead, petitioner's counsel

14 raised this issue on his cross-examination of Scott.  However, Scott was unable to identify the

15 location of the shovel using this photograph.  The record clearly demonstrates that the photograph

16 of the shovel was not "false," as alleged by petitioner.  For these reasons, petitioner's claim that

17 the investigating officers moved the shovel in order to frame him, in violation of Napue, is

18 without merit.[3]

19 VIII.  Claim 4:  Insufficient Evidence

20       Petitioner alleges that there is insufficient evidence to support his conviction for making

21 criminal threats against Jessica on December 12, 2010 in violation of California Penal Code

22 § 422.  (ECF No. 1 at 31-33.)  The standard for evaluating a claim alleging insufficient evidence

23 is set forth in the section above addressing claim 1.

24       Petitioner argues that the only evidence offered at trial of the criminal threat he made

25 against Jessica was her written statement, set forth in the section above discussing petitioner's

26

27 [3]  Deputy Ross, whose report stated that the shovel was found on a rack, was called as a defense
   witness.  (RT at 331.)  However, neither petitioner's counsel nor the prosecutor asked Deputy
28 Ross any questions regarding where the shovel was found.

claim alleging that the prosecutor knowingly presented perjury.  Petitioner argues that Jessica's

father did not state that he heard petitioner make threats.  Petitioner also argues that at the

preliminary hearing and trial, Jessica testified that petitioner did not threaten her.  Petitioner

argues that based on the conflicting evidence in the declaration submitted by Jessica's father and

Jessica's trial testimony, the statements in Jessica's written declaration were insufficient to

support his conviction for making criminal threats.[4]

The undersigned sets forth Jessica's written statement again herein:

> Me and Dylan got in an argument earlier in the night.  He came back
> drunk and started acting out when I asked him to leave.  He started
> throwing our stuff out of the truck saying if I left him he would kill
> me.  I told him I did not want to be with him anymore and that he
> needed to leave and that I was calling 911 and they would get him
> for drunk in public.  He then stated he would kick the door in and
> kill me before the cops could get there.  Then I shut the door and
> locked it and told my parents to call 911.  I looked out the window
> and saw him walking toward Sportsman's.  I am in fear for my
> safety.  Dylan is mentally unstable.  When he snaps he doesn't
> come out of it easily.  When he said he was going to kill me before
> the police arrived he had a steel bar in his hand waiving it.

(RT at 272-73.)

The statement of Jessica's father was read at trial:

> I heard arguing outside my home.  My daughter was at the door and
> Dylan Corral was in the road next to his truck throwing things on
> the ground.  I yelled at him, "What's going on?"  He pulled a metal
> rod out of the back of the truck and raised it in a threatening
> manner.  I came in and my wife called the police.

(RT at 299.)

At trial, Jessica testified that the statement she gave to the police on December 12, 2010,

was the truth.  (Id. at 270.)  She also testified that she could not remember petitioner threatening

her on that occasion.  (Id. at 275.)

As stated by the California Court of Appeal, to prove criminal threats under section 422

the prosecution must demonstrate, "(1) that the defendant "willfully threaten [ed] to commit a

---

[4]  In claim 6, petitioner raises another claim alleging insufficient evidence to support his
conviction for making criminal threats against Jessica on December 12, 2010, but on different
grounds.

crime which will result in death or great bodily injury to another person," (2) that the defendant

made the threat "with the specific intent that the statement ... is to be taken as a threat, even if

there is no intent of actually carrying it out," (3) that the threat ... was "on its face and under the

circumstances in which it [was] made, ... so unequivocal, unconditional, immediate, and specific

as to convey to the person threatened, a gravity of purpose and an immediate prospect of

execution of the threat," (4) that the threat actually caused the person threatened "to be in

sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that

the threatened person's fear was "reasonabl[e]" under the circumstances.'" In re George T., 33

Cal.4th at 630.

It is reasonable to infer from the declaration of Jessica's father that he did not hear

petitioner make the threats against his daughter.  In other words, it is not reasonable to infer from

the declaration of Jessica's father that petitioner did not make the threats.  Jessica's written

statement to police contained sufficient evidence of a criminal threat by petitioner in violation of

California Penal Code § 422, i.e., he threatened to kick the door down and kill her before the cops

arrived, while waiving a metal bar.  While Jessica testified that she could not remember petitioner

making this threat, a rational trier of fact could find petitioner guilty of this offense based on

Jessica's written statement.  Petitioner's claim alleging insufficient evidence to support his

conviction for making criminal threats against Jessica on December 12, 2010, is without merit.

IX.  Claim 5:  Witness Statement Not Admissible

In claim 5, petitioner alleges that Jessica's written statement regarding the December 12,

2010 incident was inadmissible because she testified at the preliminary hearing that at the time of

this incident, she was on methamphetamine and not taking her psychiatric medication.  (ECF No.

1 at 35-36.)  Petitioner also argues that at trial, Jessica testified that she was on drugs and not in

the right state of mind.[5]  (Id.)

////

---

[5]   At the trial, Jessica testified that on December 12, 2010, she was "not awake.  I could barely walk.  I had been up for weeks prior to this and hadn't been getting sleep for a day and a half because I found out I was pregnant."  (RT at 270.)  She also testified that she was "delirious." (Id. at 276.)

1   In support of this claim, petitioner argues a violation of California Evidence Code section

2   1252 which states, "Evidence of a statement is inadmissible under this article if the statement was

3   made under circumstances such as to indicate its lack of trustworthiness."  The article this section

4   refers to is the one governing the use of hearsay.  (See Evid.Code, §§ 1200 et seq.)

5   However, Jessica's written statement was admitted pursuant to California Evidence Code

6   section 1237 (see RT at 270), which sets forth a hearsay exception for past recollections recorded.

7   Generally, a state court's decision to admit specific evidence is not subject to federal

8   habeas review unless the evidentiary ruling violates federal law or deprives the defendant of a

9   fundamentally fair trial.  Estelle v. McGuire, 502 U.S. 62, 67-68, 75 (1991) (finding federal

10   habeas relief inappropriate where admission of evidence was not so unfair as to result in denial of

11   due process); Dowling v. United States, 493 U.S. 342, 352 (1990) (analyzing "whether the

12   introduction of this type of evidence is so extremely unfair that its admission violates

13   fundamental conceptions of justice") (internal quotation marks omitted).

14   Thus, to the extent that petitioner contends that the trial court erred under California law

15   in admitting Jessica's written statement from December 12, 2010, this claim is not cognizable on

16   federal habeas review.  To the extent petitioner argues that the admission of the hearsay

17   statements was prejudicial and therefore presents a federal constitutional issue, the undersigned is

18   not persuaded.  As the Ninth Circuit noted in Holley v. Yarborough, 568 F.3d 1091, 1101 (9th

19   Cir. 2009), citing Carey v. Musladin, 549 U.S. 70, 77 (2006), the Supreme Court has made very

20   few rulings regarding the admission of evidence as a violation of due process.  The Supreme

21   Court has not yet made a clear ruling that the admission of irrelevant or overtly prejudicial

22   evidence constitutes a due process violation sufficient to warrant issuance of the writ.

23   The Ninth Circuit has noted that a habeas petitioner bears a "heavy burden" in

24   demonstrating a due process violation on the basis of a state court's evidentiary decision, as he

25   must show that there were "no permissible inferences" the jury could draw from the challenged

26   evidence.  Boyde v. Brown, 404 F.3d 1159, 1162 (9th Cir. 2005) (internal quotation marks

27   omitted); see also McKinney v. Rees, 993 F.2d 1378, 1384 (9th Cir 2009).

28   ////

1    Here, there were permissible inferences that could be drawn from Jessica's written

2    statement, so that its admission cannot be said to have rendered petitioner's trial so

3    "fundamentally unfair" as to violate due process.  Holley, 568 F.3d at 1101.  Accordingly, this

4    claim is without merit .[6]

5    X.  Claim 6: Insufficient Evidence

6        In claim 6, petitioner alleges that his conviction for making criminal threats against

7    Jessica on December 12, 2010, is not supported by sufficient evidence because it is based solely

8    on hearsay, i.e., Jessica's written statement.  (ECF No. 1 at 38.)

9        Petitioner is correct that his conviction for making criminal threats against Jessica on

10   December 12, 2010, was largely based on her written declaration.  However, a court reviewing a

11   sufficiency of the evidence claim must consider all of the evidence admitted at trial, regardless of

12   whether any of the evidence was erroneously admitted.  Valdez v. Virga, 2014 WL 3709634 at *

13   7 (C.D. Cal. 2014) (citing McDaniel v. Brown, 558 U.S. 120, 131 (2010).  The question is

14   whether a rational jury could find that petitioner made a criminal threat against Jessica based on

15   the evidence before it, including Jessica's written statement which petitioner argues was wrongly

16   admitted.

17       Under this standard, there was sufficient evidence to support petitioner's conviction for

18   making a criminal threat against Jessica on December 12, 2010.  In her declaration, Jessica stated

19   that petitioner threatened to kill her while wielding a metal bar.  Based on this statement, a

20   rational jury could find that petitioner made a criminal threat against Jessica as defined by

21   California Penal Code § 422.  Accordingly, this claim should be denied.

22   ////

23   ////

24   _____

25   [6]   Petitioner may be arguing that admission of Jessica's declaration violated the Confrontation
     Clause.  However, because Jessica testified at trial and was subject to cross-examination by

26   petitioner's counsel, admission of her declaration did not violate the Confrontation Clause.  See
     Davis v. Washington, 547 U.S. 813, 823-24 (2006); Crawford v. Washington, 541 U.S. 36, 53-54

27   (2004) (The Confrontation Clause bars "admission of testimonial statements of a witness who did
     not appear at trial unless he was unavailable to testify, and the defendant …had a prior

28   opportunity for cross-examination.")

XI.  <u>Claim 7:  Inconsistent Statements</u>

In claim 7, petitioner alleges that several witnesses made inconsistent statements.  (ECF No. 1 at 39-46.)

First, petitioner alleges that Jessica made inconsistent statements regarding the events of December 12, 2010.  (<u>Id.</u> at 39-42.)  In essence, these allegations are further (duplicative) briefing in support of petitioner's claims alleging insufficient evidence to support his conviction for making criminal threats against Jessica on December 12, 2010.  In other words, these allegations do not state a separate claim for relief.  The undersigned has considered these further allegations in the sections above addressing petitioner's related claims alleging insufficient evidence and will not address them further.

Second, petitioner alleges that Danielle and Robert made inconsistent statements regarding what occurred during the March 2011 incident and that they committed perjury.  (<u>Id.</u> at 42-46.)  Petitioner restates his claims, discussed above, that Danielle and Robert made inconsistent statements regarding whether petitioner had a shovel.  (<u>Id.</u>)  The undersigned addressed these claims above and will not address them further.

XII.  <u>Claim 8:  Alleged Ineffective Assistance of Trial Counsel</u>

A.  <u>Legal Standard</u>

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel."  <u>Yarborough v. Gentry</u>, 540 U.S. 1, 4 (2003) (per curiam).  To succeed on an ineffective assistance of trial counsel claim, petitioner must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced the defense.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  "'To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'"  <u>Harrington v. Richter</u>, 562 U.S. 86, 104 (2011) (citation omitted).

Prejudice "focuses on the question whether counsel's deficient performance renders the results of the trial unreliable or the proceeding fundamentally unfair."  <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372 (1993); <u>Williams v. Taylor</u>, 529 U.S. 362, 393 n.17 (2000).  That is, petitioner must establish there is a "reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different[,]" Strickland, 466 U.S. at 694, and "[t]he likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 112.

Petitioner bears the burden of establishing both components. Williams, 529 U.S. at 390-91; Strickland, 466 U.S. at 687. However, the court need not determine whether counsel's performance was deficient before examining the prejudice the alleged deficiencies caused petitioner. See Smith v. Robbins, 528 U.S. 259, 286 n.14 (2000) ("'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed.'" (quoting Strickland, 466 U.S. at 697)).

B.  Petitioner's Claims

Petitioner alleges that his trial counsel was ineffective for failing to present evidence that petitioner was framed by the officers investigating the incident who moved the shovel from the rack to the ground. (ECF No. 1 at 47-49.) Petitioner alleges that counsel failed to ask Deputy Ross any questions concerning where he found the shovel. (Id. at 48.) Petitioner alleges that if counsel had asked Deputy Ross where he found the shovel, it would have shown that the shovel was tampered with. (Id.)

Petitioner also alleges that trial counsel was ineffective for failing to present evidence that the witnesses had given statements inconsistent with their testimony. (Id. at 48.) Petitioner argues that if the jury had heard evidence of these inconsistent statements, the jury would have seen that "they" were all lying to protect Scott. (Id.) Petitioner argues that trial counsel was ineffective for failing to inform the jury that no one on the night of the incident mentioned that petitioner made a threat or used a shovel. (Id. at 49.)

Petitioner also argues that trial counsel was ineffective for failing to present photos showing the severity of petitioner's injuries. (Id. at 48.)

C.  Superior Court Opinion

The Glenn County Superior Court is the last state court to issue a reasoned decision addressing the merits of ineffective assistance of counsel petitioner's claims. Accordingly, the undersigned gives AEDPA deference to this decision.

////

1      The Glenn County Superior Court denied petitioner's ineffective assistance of counsel

2 claim for the reasons herein:

3        Petitioner essentially argues that trial counsel should have

4 "discovered" facts supporting Petitioner's claim of innocence, namely that there was a conspiracy by the detectives and/or the

5 witnesses to frame Petitioner by tampering with evidence and otherwise introducing false evidence relating to Petitioner's use of a

6 shovel on March 4, 2011. According to the opinion on appeal, after Petitioner and the victims engaged in a lengthy verbal altercation,

7 Petitioner drove a car towards Scott Verry, forcing Verry to jump out of the way. Petitioner crashed the car into a tree, got out,

8 wrestled with Verry and screamed, "I'm going to kill you" at everyone. Verry armed himself with a machete and Petitioner

9 picked up a shovel, yelling "Where the fuck is she? I'll fucking kill you." Petitioner ran at Verry, swinging the shovel. Verry knocked

10 Petitioner down and the confrontation ended. (Exhibit A at p. 2.)

11        Based on the exhibits attached to the petition, it appears that Danielle Nilsen testified as to Petitioner's conduct with the shovel.

12 (Exhibit G.) In addition, Verry also testified that he saw Petitioner holding up a shovel and heard someone say, "He has a shovel."

13 (Exhibit O.) Verry testified that Petitioner came after Verry with a shovel. (Exhibit P.) Robert Combs also testified that Petitioner

14 went after Verry with a shovel. (Exhibit R.) In addition, in what appears to be an interview on March 4, 2011, Verry stated that after

15 Petitioner almost hit Verry with the car, he came towards Verry with a shovel. (Exhibit at p. 4.) At that time, Detective Felton told

16 Verry that the other witnesses did not see the shovel or machete. (Id. at p. 7.) Verry testified that after he hit Petitioner, Petitioner

17 dropped the shovel. Trial counsel did cross-examine Verry on how the shovel came to be found where it was by the detectives.

18 (Exhibit T.)

19        Petitioner does not explain how trial counsel could have "discovered" any additional evidence to support Petitioner's claim

20 that the evidence involving the shovel was fabricated. Verry, at least, was cross-examined on the issue of the shovel, which Verry

21 described Petitioner dropping on the ground, was found off the ground by the detectives. The record attached to the petition does

22 not indicate whether trial counsel ever cross-examined any other witnesses about the shovel. However, Petitioner does not identify

23 any evidence that the testimony about the shovel was fabricated. The fact that the witnesses gave incomplete or even conflicting

24 statements is not evidence of perjury. Consequently, Petitioner has not shown that trial counsel was ineffective.

25 (ECF No. 24-1 at 17-19.)

26     D. Discussion

27      For the reasons discussed herein, the undersigned finds that the denial of petitioner's

28 claim by the Superior Court was not an unreasonable application of clearly established Supreme

1    Court authority.[7]

2         The undersigned first addresses petitioner's claim that trial counsel was ineffective in

3    failing to investigate and present evidence that he was framed by the officers investigating the

4    incident who moved the shovel from the rack to the ground.  Petitioner also argues that trial

5    counsel failed to ask Deputy Ross any questions regarding where he found the shovel.

6         As discussed above, the prosecutor did not use the photograph of the shovel to show

7    where the shovel was found.  Instead, the prosecutor showed the photograph to witnesses so that

8    they could identify the shovel as the shovel used by petitioner.  Based on these circumstances, as

9    discussed above, petitioner's argument that the investigating officers framed him is without merit.

10   Therefore, petitioner's counsel was not ineffective for failing to investigate and provide evidence

11   in support of this theory.

12        Deputy Ross was called as a defense witness.  (RT at 331-37.)  Petitioner is correct that

13   his trial counsel did not ask him about the statement in his report that he found the shovel in a

14   rack.  Scott testified that petitioner dropped the shovel after Scott hit him with the machete.  (RT

15   at 171.)  No evidence was offered to explain how the shovel got from the ground to the rack.

16   Evidence that the shovel was found in a rack, and not on the ground where Scott claimed

17   petitioner threw it, would have offered some support to petitioner's defense that Scott, Robert and

18   Danielle made up the story about the shovel in order to protect Scott.  However, for the reasons

19   _____

20   [7]   The petition filed by petitioner in the Superior Court appears identical to the petition filed in
      the instant action.  (See Respondent's Lodged Document 6.)  In both petitions, petitioner attached
21   the reports discussed above as well as portions of the trial transcript.  In support of the answer
      filed in the instant action, respondent provided a copy of the entire trial transcript.  It is clear that
22   the Superior Court reviewed only those portions of the trial transcript attached to the petition and
      did not review the entire transcript, as has the undersigned.  A state court's failure to review the
23   entire transcript in deciding a habeas raising an ineffective assistance of counsel claim may
      constitute an unreasonable determination of the facts that is not entitled to AEDPA deference.
24   See Winston v. Kelly, 592 F.3d 535, 555-56 (4th Cir. 2010) ("[i]f the record ultimately proves to
      be incomplete, deference to the state court's judgment would be inappropriate because judgment
25   on a materially incomplete record is not an adjudication on the merits for purposes of § 2244(d).")
      While review of the entire transcript may have benefited the Superior Court's decision, the
26   undersigned does not find that the record before the trial court was materially incomplete.
      Accordingly, the undersigned gives AEDPA deference to the Superior Court's opinion.
27   However, even if the undersigned conducted a de novo review, the undersigned would find
      petitioner's ineffective assistance of counsel claim to be without merit.
28

1    stated herein, the undersigned does not find that petitioner was prejudiced by trial counsel's

2    failure to question Deputy Ross about finding the shovel in the rack, as stated in a report.

3         Even if the jury had heard evidence that Deputy Ross found the shovel on a rack, it is not

4    likely that the outcome of the trial would have been different.  As discussed above, the jury found

5    the testimony of Scott, Robert and Danielle regarding petitioner's use of a shovel to be credible,

6    even knowing that they initially did not mention petitioner using a shovel.  In addition, the shovel

7    was found with blood on it.  Although no evidence was presented that the blood on the shovel

8    belonged to petitioner, evidence was presented that petitioner had blood on his hands after

9    punching through the glass window of Danielle's car.  Based on this evidence, it was reasonable

10   to infer that the blood belonged to petitioner.  In addition, the jury heard evidence regarding other

11   similar incidents involving petitioner using weapons to assault people.  Based on all of this

12   evidence supporting petitioner's conviction for assaulting Scott with the shovel, it is unlikely that

13   the jury would have found petitioner not guilty of this offense had they heard evidence that the

14   shovel was found on a rack.  For this reason, this claim of ineffective assistance of counsel is

15   without merit.

16        Petitioner also alleges that trial counsel was ineffective for failing to present evidence that

17   the witnesses had given statements inconsistent with their testimony.  Petitioner argues that if the

18   jury had heard evidence of these inconsistent statements, the jury would have seen that "they"

19   were all lying to protect Scott.

20        Petitioner's counsel cross-examined Scott, Danielle and Robert regarding their statements

21   to police where they failed to mention petitioner's use of a shovel.  (RT at 119 (Danielle), 172-73

22   (Scott), 206-08 (Robert).)  Defense counsel also called Detective Felton as a defense witness and

23   questioned him about Scott's failure to mention petitioner's use of a shovel during questioning.

24   (RT at 321-23.)  Thus, contrary to petitioner's claim, trial counsel did present evidence that

25   Danielle, Robert and Scott had initially failed to mention petitioner's use of a shovel.  It is unclear

26   what additional evidence petitioner is claiming counsel could have presented regarding this issue.

27   Because counsel did present evidence of the witnesses' prior inconsistent statements, and

28   petitioner has not demonstrated what other evidence counsel should have presented, this claim is

1    without merit.

2           Finally, petitioner argues that trial counsel was ineffective for failing to introduce

3    photographs showing the severity of his injuries from the machete.  It is not clear whether

4    photographs of petitioner's injuries would have been admissible had trial counsel tried to enter

5    them.  However, it is not likely that the outcome of the trial, and in particular petitioner's

6    conviction for assault with a deadly weapon, would have been different had photographs of

7    petitioner's injuries been presented to the jury.  This finding is supported by the fact the jury

8    heard testimony describing the nature of petitioner's injuries.  Accordingly, this claim of

9    ineffective assistance of counsel is without merit.

10   XIII.  Claim 9:  Alleged Ineffective Assistance of Appellate Counsel

11          A.  Legal Standard

12          The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant

13   the effective assistance of counsel on his first appeal as of right.  Evitts v. Lucey, 469 U.S. 387,

14   391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to

15   the standard set out in Strickland v. Washington, 466 U.S. 668 (1984).  Smith v. Robbins, 528

16   U.S. 259, 285 (2000); Moormann v. Ryan, 628 F.3d 1102, 1106 (9th Cir.  2010).  The petitioner

17   must show that counsel's performance was objectively unreasonable, which in the appellate

18   context requires the petitioner to demonstrate that counsel acted unreasonably in failing to

19   discover and brief a merit-worthy issue.  Smith, 528 U.S. at 285; Moormann, 628 F.3d at 1106.

20   The petitioner also must show prejudice, which in this context requires the petitioner to

21   demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the

22   petitioner would have prevailed in his appeal.  Smith, 528 U.S. at 285-86; Moormann, 628 F.3d at

23   1106.

24          B.  Petitioner's Claims

25          Petitioner alleges that his appellate counsel was ineffective for failing to present a claim

26   that petitioner was innocent of making a criminal threat against Jessica in December 2010 based

27   on Jessica's "state of mind," Jessica's inconsistent statements, and insufficient evidence.  (ECF

28   No. 1 at 52.)

1    Petitioner also argues that his appellate counsel was ineffective for failing to "figure out"

2    that petitioner was framed by the detectives investigating the offense based on evidence

3    tampering, i.e., the alleged moving of the shovel.  (Id.)

4    Petitioner argues that appellate counsel was ineffective for failing to argue that the

5    witnesses committed perjury.  (Id.)  Petitioner also argues that his trial counsel should have filed a

6    petition for review to the California Supreme Court after the Court of Appeal affirmed his

7    conviction.  (Id.)

8    C.  Superior Court Opinion

9    The Glenn County Superior Court denied petitioner's ineffective assistance of appellate

10   counsel claims for the reasons stated herein:

11   
12   Appellate counsel performs "properly and competently when he or she exercises discretion and presents only the strongest claims instead of every conceivable claim."  (In re Robbins (1998) 18 Cal.4th 770, 810.)

13   

14   Petitioner suggests that appellate counsel should have filed a petition for review on the issue of whether there was sufficient evidence to support the conviction for making a criminal threat in the March 4, 2011 incident.  Appellate counsel explained that he did not file a petition for review because he "did not feel that [Petitioner's] case had any issues that warred [sic] filing such a petition." (Exhibit B.)  The Court of Appeal rejected Petitioner's claim that there was insufficient evidence of this charge.  Petitioner has not provided any authority to support his conclusion that there was sufficient evidence; nor has he shown that a petition for review likely would have been granted or resulted in a reversal of this conviction.

15   

16   

17   

18   

19   

20   In addition, Petitioner argues that appellate counsel should have raised additional claims in the direct appeal:  there was conflicting evidence about the presence, location and use of the shovel; there was insufficient evidence of the criminal threat against Jessica A. in 2010; Jessica A.'s testimony was not credible; and hearsay evidence was introduced.  However, questions of fact, such as evaluating conflicting evidence and determining the credibility of witnesses, are matters that generally cannot be raised on appeal. (See People v. Jones (2013) 57 Cal.4th 899, 963 ["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact"].)

21   

22   

23   

24   

25   

26   As to the claim that there was insufficient evidence of the December 2010 criminal threat, Petitioner refers to evidence that Jessica denied that Petitioner threatened her, but omits the evidence that he did threaten her.  In fact, the opinion on appeal states that Petitioner took a metal bar out of the truck, raised it in a threatening

27   

28   

43

1       manner and said he would break down the door and kill her before
2       the police arrived.  She was in fear for her safety.  (Exhibit A at p.
        1.)  As there was evidence in the record that Petitioner willfully
3       threatened to kill Jessica with the intent that his words be taken as a
        threat, the threat conveyed to Jessica that it would be carried out,
4       and Jessica was in sustained fear, Petitioner has not shown that
        appellate counsel's failure to raise a claim of insufficient evidence
5       was unreasonable.  (See CALCRIM No. 1300.)

6       Finally, Petitioner claims that hearsay evidence was improperly
        admitted, apparently referring to a statement that Jessica wrote for
7       the Orland Police Department on December 12, 2010, which was
        admitted into evidence as Exhibit 17.  As the record indicates that
8       the statement was admitted under Evidence Code section 1237,
        which is an exception to the hearsay rule, Petitioner has not shown
9       that appellate counsel's failure to raise this issue on appeal was
        unreasonable.

10      (ECF No. 24-1 at  19-21.)

11          D.  Discussion

12          For the reasons stated herein, the undersigned finds that the Superior Court's denial of

13   petitioner's claims alleging ineffective assistance of counsel was not an unreasonable application

14   of clearly established Supreme Court authority.

15          First, the Superior Court correctly found that claims alleging perjury and false evidence

16   are properly raised in habeas corpus petitions rather than on direct appeal.  See In re Richards, 55

17   Cal.4th 948, 976 (2012); Cal. Penal Code § 1473(b).  For that reason, petitioner's appellate

18   counsel was not ineffective for failing to raise petitioner's claims alleging perjury on direct

19   appeal.

20          Second, the Superior Court reasonably found that there was sufficient evidence to support

21   petitioner's conviction for making criminal threats against Jessica in December 2010.  The

22   undersigned above found that petitioner's related federal claims challenging his conviction for

23   making criminal threats against Jessica in December 2010.  Petitioner's appellate counsel was not

24   ineffective for failing to challenge the sufficiency of petitioner's conviction for making criminal

25   threats in December 2010 on the grounds alleged because there was sufficient evidence to support

26   petitioner's conviction for this offense.

27          Third, the Superior Court reasonably found that appellate counsel was not ineffective for

28   failing to file a petition for review.  The Superior Court reasonably found that a petition for

1   review raising the insufficient evidence claim denied by the California Court of Appeal would

2   have been denied by the California Supreme Court.

3         Petitioner may also be claiming that appellate counsel was ineffective for failing to raise a

4   claim challenging admission of Jessica's written statement admitted as evidence regarding the

5   December 2010 evidence.  Petitioner may be claiming that this written statement was wrongly

6   admitted.

7         As discussed above, Jessica's written statement was admitted pursuant to California

8   Evidence Code § 1237.  Under Evidence Code section 1237, a past recollection recorded is not

9   made inadmissible by the hearsay rule if (1) the statement would have been admissible if made by

10   the witness while he or she testified, (2) the witness is unable to adequately recall and testify fully

11   and accurately about the matter in question, and (3) the recorded statement was made when the

12   fact was fresh in the witness's mind, was made by the witness or by another person for the

13   purpose of recording the witness's statement, is affirmed by the witness as true, and is offered

14   after the writing is authenticated as an accurate record.

15         Evidence Code section 1237 creates a narrow exception to the hearsay rule that is justified

16   by the declarant's ability to attest to the trustworthiness of his or her out-of-court statement.  "The

17   motive behind [Evidence Code] section 1237 is to allow previously recorded statements into

18   evidence where the trustworthiness of the contents of those statements is attested to by the maker,

19   subject to the test of cross-examination...."  People v. Simmons, 123 Cal.App.3d 677, 682 (1981),

20   abrogated on other grounds as recognized by People v. Gunder, 151 Cal.App.4th 412 (2007).

21         While Evidence Code section 1237 recognizes that a witness' memory concerning an out-

22   of-court statement he or she made is likely to fade over time, the witness must have some

23   recollection of making the statement to ensure the statement's reliability and trustworthiness.  See

24   Simmons, 123 Cal.App.3d at pp. 682–683.  The exception's required trustworthiness is not

25   established when a witness has no recollection of making the statement or no memory of

26   engaging in the conversation in which the statement was made.  See Evid.Code, (West's Ann.) §

27   1237, comment, p. 225 ["sufficient assurance of the trustworthiness of the statement is provided if

28   the declarant is available to testify that he made a true statement"].)  Otherwise, the witness

1  would only be speculating about the truth of the statement or conversation which would carry no

2  evidentiary value.  See Simmons, 123 Cal.App.3d at pp. 683–684.).

3      The law cited above indicates that a statement that meets the requirements for

4  admissibility under § 1237 is trustworthy, i.e. admissible under § 1252.  Thus, petitioner's real

5  argument appears to be that the trial court erred in ruling that Jessica's written statement was

6  admissible under California Evidence Code § 1237.

7      Based on the standards for admission of statements pursuant to this section, set forth

8  above, Jessica's written statement was properly admitted.  First, Jessica's written statements

9  regarding what petitioner did and said on December 12, 2010, would have been admissible had

10  she made them while testifying.  Second, Jessica testified that she could not adequately recall the

11  events of December 12, 2010.  (See RT at 267-70.)  Jessica's written statement was made on the

12  same night as the December 12, 2010 incident after the police asked her to write down a

13  statement.  (Id. at 269-70.)  At trial, Jessica testified that what she stated in the statement was the

14  truth.  (Id. at 270.)  At trial, the statement was authenticated.  (Id. at 271.)

15      Because Jessica's written statement was properly admitted under § 1237, a claim by

16  appellate counsel that the statement did not meet the requirements for admission under this

17  section would have been denied.  Accordingly, appellate counsel was not ineffective for failing to

18  raise this claim.

19      For the reasons discussed above, petitioner's claim alleging ineffective assistance of

20  appellate counsel is without merit.

21      Accordingly, IT IS HEREBY ORDERED that:

22      1. Petitioner's application for a writ of habeas corpus is denied; and

23      2. A certificate of appealability is not issued.

24  Dated:  March 15, 2017

25

26

Cor3007.157

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

27

28